# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

_____

**GREGORY VANEYCK, Personal Representative**
**of the ESTATE OF WILLIAM VANEYCK, Deceased**

       **Plaintiff,**

**vs.**

**OTTAWA COUNTY, a Municipal Corporation,**
**CAPTAIN STEVEN BAAR, in his Individual, Supervisory and Official**
**Capacities, PETER KIRSTEN, Individually, AARON OVERWAY,**
**Individually, TIM PIERS, Individually,**
**COMMUNITY MENTAL HEALTH OTTAWA COUNTY, WELLPATH**
**f/k/a, CORRECT CARE SOLUTIONS, MARY DERKSEN, NP, individually;**
**DR. JOSEPH NATOLE, MD, individually,**

       **Defendants,**

_____/

## COMPLAINT AND DEMAND FOR JURY

Plaintiff, Gregory Vaneyck as the Personal Representative of the Estate of

William Vaneyck, by and through his attorneys, states for his Complaint and Jury

Demand against Defendants as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff Gregory Vaneyck,

duly appointed Personal Representative of the Estate of William Vaneyck,

Deceased seeks relief and all damages that flow from Defendants' multiple

violations of decedent William Vaneyck's rights, privileges and immunities as

1

secured by the Eighth and Fourteenth Amendments to the United States Constitution, pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.

2.     During the period of incarceration defendants owed plaintiff's decedent, as a pretrial detainee and thereafter a duty to provide reasonable medical and mental health care without deliberate indifference to serious mental health or medical need, including the substantial risk of suicide by failing to provide timely access to qualified mental health/medical care, assessment, treatment and/or reasonable precautions amounting to deliberate indifference after plaintiff's decedent showed a persistent and strong likelihood that he would attempt suicide until final execution by strangulation, or otherwise, following multiple suicide attempts by hanging, including multiple deliberate acts of substantial self-harm.

3.     At all times, defendants had actual knowledge and drew the conclusion that plaintiff's decedent would continue to attempt suicide until successful. Notwithstanding both objective and subjective knowledge of the substantial risk to inmate health or safety, defendants were deliberately indifferent, which violated plaintiff decedent's constitutional rights under the Eighth, and Fourteenth Amendments to the United States Constitution. These violations were a proximate cause of unnecessary pain, exacerbation of mental illness and death of William Vaneyck and of the consequent damages to his Estate.

2

4.    Plaintiff decedent William Vaneyck's death, on March 12, 2018, was a proximate result of defendants' deliberate indifference and/or objectively unreasonable failure to respond to his serious medical and mental health needs while housed as a pretrial detainee in the Ottawa County Jail.

5.    On behalf of the Estate of William Vaneyck, Personal Representative Gregory Vaneyck seeks all relief appropriate and allowable resulting from the constitutional violations defendants inflicted upon William Vaneyck.

6.    As part of the aforementioned relief, plaintiff seeks damages for the estate including any and all damages recoverable under the Michigan Wrongful Death Act, M.C.L.A. §600.2922(6) an award of attorney fees and costs, including punitive damages under 42 U.S.C. §1983 and Equal Access to Justice Act, 42 U.S.C. §1988, and any further relief the Court deems proper, reasonable and just.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction as this is a federal action arising under the Eighth and Fourteenth Amendments to the United States Constitution and brought pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988.

8.    Pursuant to 28 U.S.C. § 1391 (b)(2), venue is proper in the United States District Court for the Western District of Michigan because it is the judicial district in which the events giving rise to the claim occurred.

9.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) dollars.

## PARTIES

10.    Plaintiff's decedent William Vaneyck was the brother of Gregory Vaneyck and Michael Vaneyck living in the city of Holland, Michigan at the time of the incidents giving rise to this litigation.

11.    William Vaneyck had enjoyed a long and close relationship with his family, including brothers Gregory Vaneyck, and Michael Vaneyck.

12.    Plaintiff Gregory Vaneyck was appointed personal representative of the Estate of William Vaneyck, deceased on July 20, 2022 and brings suit within two years of Letters of Authority pursuant to MCL 600.5852.

13.    Defendant COUNTY OF OTTAWA (hereinafter "COUNTY") is a municipal corporation authorized by the laws of the state of Michigan to operate the Ottawa County Jail. As part of its responsibilities and services the COUNTY operates the Ottawa County Sheriff's Department that among other duties and responsibilities, operates and controls the Ottawa County Jail. At all relevant times herein, the COUNTY acted under color of law in the formation and implementation of policies and protocols regarding conditions of confinement, inmate safety including suicide prevention and pursuant to certain customs,

4

policies, and/or practices, which were the moving force behind the constitutional violations asserted herein.

14.   Defendant, Sheriff's Captain STEVEN BAAR was at all relevant times Ottawa County Jail captain employed by defendant COUNTY acting under color of law within the scope of his employment which included management responsibility and supervisory authority pursuant to the COUNTY'S customs, policies and practices. Defendant STEVEN BAAR is sued in his individual, supervisory, and official capacities, as official policymaker for Defendant County regarding but not limited to, day -to-day operation of the jail including housing classification.

15.   That among Capt. BAAR's supervisory authority and management responsibilities was *inter ali*a housing classification for detainees, including decedent Vaneyck.

16.   Defendant PETER KIRSTEN was at all relevant times an Ottawa County Jail corrections officer employed by defendant COUNTY acting under color of law within the scope of his employment with authority pursuant to the COUNTY'S policies practices and customs. Defendant PETER KIRSTEN is sued in his individual capacity.

17.    Defendant AARON OVERWAY was at all relevant times an Ottawa County Jail corrections officer employed by defendant COUNTY acting under

color of law within the scope of his employment with authority pursuant to the

COUNTY'S policies, practices and customs. Defendant AARON OVERWAY is

sued in his individual capacity.

18. Defendant WELLPATH, LLC f/k/a CORRECT CARE SOLUTIONS, LLC

(hereinafter referred to as ("Wellpath/CCS") was a Kansas Corporation, registered to

conduct business in Michigan and was conducting business as Correct Care Solutions

in Ottawa County, Michigan as a for profit foreign corporation licensed to do business

in the state of Michigan at all relevant times obligated under contract to provide health

care to Ottawa County Jail inmates, including but not limited to formation and

implementation of health care protocols, policies and/or customs and/or practices for

the provision of medical and mental health services at the Ottawa County Jail, and as

such was acting at all times herein under color of law and pursuant to certain

customs, policies, and/or practices, which were the moving force behind the

constitutional violations asserted herein.

19. Defendant MARY DERKSEN is a licensed Nurse Practitioner who is a

current or former employee or agent of Defendant Wellpath/CCS, acting at all

times herein within the scope of her employment with Wellpath/CCS, under color

of law when she provided health care services to pre-trial detainees housed in the

OTTAWA COUNTY JAIL including William Vaneyck. Defendant MARY

DERKSEN is sued in her individual capacity.

20.   Defendant JOSEPH NATOLE, MD, upon information and belief is Board Certified Family Practice Physician licensed in the state of Michigan and is either an agent of or current or former employee of defendant Wellpath/CCS acting at all times herein under color of law as medical director and jail physician supervisor within the scope of his agency/employment with Wellpath/CCS while providing health care services to pre-trial detainees housed in the OTTAWA COUNTY JAIL including William Vaneyck. Defendant JOSEPH NATOLE, MD is sued in both individual and supervisory capacity.

21.   Defendant COMMUNITY MENTAL HEALTH OTTAWA COUNTY(CMHOC) was established by Public Act 258 to provide mental health services to Ottawa County adults with severe and persistent mental illness who are within the criminal justice system and was acting at all times herein under color of law and pursuant to certain customs, policies, and/or practices, which were the moving force behind the constitutional violations asserted herein.

22.   Defendant TIM PIERS, LLMSW is a licensed social worker who is a current or former employee of defendant COMMUNITY MENTAL HEALTH OTTAWA COUNTY(CMHOC) acting in the scope of his employment with CMHOC and under color of law who provided mental health care services to pre-trial detainees housed in the OTTAWA COUNTY JAIL, including decedent William Vaneyck. Defendant TIM PIERS is sued in his individual capacity.

23.    Defendant Wellpath/CCS under its contract with Defendant COUNTY supplied employees and/or agents including Defendant MARY DERKSEN and jail physician Defendant JOSEPH NATOLE to provide medical services to pretrial detainees and inmates housed in the COUNTY jail, and as such was at all times relevant herein acting under color of law and pursuant to certain customs, policies, and/or practices, which were the moving force behind the constitutional violations asserted herein.

### FACTUAL ALLEGATIONS REGARDING PRETRIAL DETENTION/ INCARCERATION AND SUICIDE OF WILLIAM VANEYCK

24.   On or about July 15, 2017, William Vaneyck was booked into the Ottawa County Jail (OCJ) on charges of Fleeing Police Officer, Resisting Obstructing, Malicious Destruction of Property and Felonious Assault.

25.    At time of booking in OCJ, William Vaneyck had been discharged from in-patient hospitalization two days earlier with diagnosis of traumatic brain injury following a head-on motor vehicle collision.

26.    At booking in OCJ, William Vaneyck's history included prior suicide attempt by hanging on May 11, 2015 while housed previously at OCJ.

27.    At booking on July 15, 2017 William Vaneyck was noted to be suffering from Major Depression Disorder, recurrent severe with psychotic symptoms and Antisocial Personality Disorder.

8

28.   Within days of his booking, on July 19, and again on July 20, 2017 William Vaneyck attempted suicide by hanging from a bedsheet while jumping from a half wall in the RTOX cell.

29.   On July 22, 2017 William Vaneyck underwent psychiatric evaluation after expressing auditory hallucinations of the "devil telling him to kill himself".

30.   On July 22, 2017 William Vaneyck was involuntarily admitted onto general psychiatric unit with diagnosis of Bipolar I Disorder, current episode depressed with psychotic features, to include suicide and self-harm precautions, medications, close monitoring and subsequently moved to Level 4 for higher level of care to protect him based upon realization of how "acutely suicidal and aggressive" William Vaneyck was.

31.   On July 26, 2017, the Ottawa County Probate Court found William Vaneyck to be a person requiring treatment because of mental illness reasonably expected to physically injure himself whose judgment is so impaired by mental illness that he is unable to understand his need for treatment presenting a substantial risk of significant physical harm to himself.

32.   On July 30, 2017, William Vaneyck again attempted suicide by jumping from a half wall in his cell.

33.   On August 2, 2017, William Vaneyck attempted suicide by hanging from a bed sheet tied to a rail until cut down by custody staff.

34.   On August 4, 5 and 7, 2017 William Vaneyck deliberately inflicted substantial self-harm by repeated head strikes against his cell door, for which, rather than being referred for the professional mental health services he clearly needed, Vaneyck was punished by hours-long chair restraint in response to obvious mental illness based upon observable self-harm.

35.   That on each subsequent occasion William Vaneyck deliberately inflicted substantial self-harm by repeated head strikes against his cell door, Defendant Capt. STEVEN BAAR, in both his individual, supervisory and official capacities, ordered and/or authorized hours-long physical chair restraint in response to obvious mental illness based upon observable self-harm.

36.   That on August 22, 24 and 25, 2017, William Vaneyck again deliberately inflicted substantial self-harm by repeated head strikes against his cell door, for which Defendant Capt. STEVEN BAAR, in his individual, supervisory and official capacities, ordered and/or authorized hours-long physical chair restraint in response to obvious mental illness based upon observable self-harm.

37.   On each of the aforementioned dates in which William Vaneyck inflicted substantial self-harm by repeated head strikes against his cell door, Vaneyk was punished with hours-long chair restraint, as ordered and/or authorized by Defendant Capt. STEVEN BAAR in his individual, supervisory and/or official

capacities, all in response to the known and obvious mental illness based upon observable self-harm and prior suicide attempts.

38.   On or about August 27, 2017, William Vaneyck reported hearing voices ordering him to harm himself.

39.   On or about August 30, 2017, William Vaneyck attempted suicide by hanging, resulting in Capt. STEVEN BAAR again ordering and/or authorizing Vaneyck to be physically placed in chair restraint in response to the known and obvious mental illness based upon observable self-harm.

40.   On September 19, 2017, William Vaneyck deliberately inflicted substantial self-harm by repeated head strikes against the cell door.

41.   On September 20, 2017 attempted suicide by hanging.

42.   On September 21, 2017 William Vaneyck reported hearing voices telling him to stop eating.

43.   On September 21, 2017 William Vaneyck was sprayed in the face with chemical spray resulting in Capt. STEVEN BAAR authorizing Vaneyck's physical chair restraint for three hours in response to obvious mental illness after smearing fecal matter on his cell window.

44. On October 2, 2017, William Vaneyck ran head-first into the cell door multiple times resulting in Capt. STEVEN BAAR authorizing Vaneyck's chair

restraint for 2.5 hour in response to obvious mental illness based upon observable self-harm.

45.  On November 6, 2017, William Vaneyck reported having thoughts of ending his life.

46.  On December 7, 2017, William Vaneyck deliberately inflicted substantial self-harm through repeated head strikes against the cell window resulting in Capt. STEVEN BAAR authorizing Vaneyck's four (4) hour physical chair restraint in response to obvious mental illness based upon observable self-harm.

47.   On December 8, 2017, although Vaneyck reported to Defendant social worker TIM PIERS that he had been banging his head on the door and agitated and "'broke down' in response to court paperwork he received and his continued lodging in G pod", and although TIM PIERS was on actual notice of Vaneyck's extensive history within the jail of self-harm and suicide attempts, he nonetheless drew the objectively unreasonable, deliberately indifferent and  inexplicable conclusion that Vaneyck was a "low risk" for suicide precaution.

48.   On December 9, 2017, William Vaneyck reported to custody staff that he was depressed and that he was the only one that can change the cycle, reporting that he would smash his head into the wall.

49. On December 9, 2017, Defendant Capt. STEVEN BAAR was notified that it was "not safe to leave (Vaneyck) in G3".

50. On December 10, 2017, William Vaneyck again attempted suicide in booking/receiving cell after reporting voices in his head telling him to jump from the half wall onto his head.

51. On December 10, 2017, defendant TIM PIERS was notified of William Vaneyck's suicide attempt, but refused to see him despite actual knowledge of the strong likelihood that Vaneyck would attempt to take his own life.

52. On December 11, 2017, despite William Vaneyck expressing hopelessness to TIM PIERS, PIERS again inexplicably recommended Vaneyck for low risk precautions.

53. On December 13, 2017, William Vaneyck attempted suicide by placing restraint chains around his neck after voicing complaints of "isolation causing him problems" in G pod housing, stating "I can't do this anymore".

54. On December 14, 2017, TIM PIERS drew the conclusion that William Vaneyck was at an elevated risk for suicide but, again inexplicably, made no referral to any qualified health provider and failed to initiate suicide precautions.

55. On December 14, 2017, Defendant TIM PIERS ordered William Vaneyck to be placed on "elevated risk" without evaluation or referral despite need

for treatment so obvious that even a lay person would recognize the need for psychological/psychiatric evaluation.

56. On December 18, 2017, TIM PIERS drew the conclusion that William Vaneyck was at a "medium risk" for suicide, but took no further suicide prevention measures.

57.  On December 19, 2017, William Vaneyck attempted suicide by hanging with blanket around his neck, resulting in Capt. STEVEN BAAR in both his individual, supervisory and official capacities, ordering and/or authorizing Vaneyck to be physically bound to the chair restraint in response to obvious mental illness based upon observable self-harm and known history of multiple suicide attempts.

58.  On December 23, 2017, William Vaneyck deliberately inflicted substantial self-harm by running from the rear of the cell slamming head first into cell window, resulting in Capt. STEVEN BAAR in both his individual, supervisory and official capacities, ordering and/or authorizing Vaneyck to be physically bound to the chair restraint in response to obvious mental illness based upon observable self-harm and known history of multiple suicide attempts.

59.  On December 26, 2017, William Vaneyck deliberately inflicted substantial self-harm by striking his head against the ceiling light fixture and after reportedly hearing voices, resulting in Capt. STEVEN BAAR in both his

14

individual, supervisory and official capacities, ordering and/or authorizing

Vaneyck's over six (6) hour physical chair restraint in response to obvious mental

illness based upon observable self-harm and known history of multiple suicide

attempts.

60. On December 28, 2017, William Vaneyck deliberately inflicted

substantial self-harm to himself, reporting that voices told him to jump from the

half wall in the RTOX cell.

61. On January 13, 2018, William Vaneyck requested mental health

services, reportedly hearing voices telling him to do bad things.

62. Defendants ignored William Vaneyck's request, despite their knowledge

of his serious medical need, and provided no mental health services in response to

his request of January 13, 2018.

63. On January 15, 2018, although William Vaneyck told TIM PIERS he

wanted a re-classification to more favorable housing TIM PIERS refused to act,

thus deliberately disregarding the substantial known risk to Vaneyck's safety and

serious medical needs, by continued housing isolation and instead recommended

Vaneyck for "low risk" precautions.

64. On or about February 27, 2018, after William Vaneyck advised TIM

PIERS of being "pessimistic and convinced that control in his life comes from

outside", TIM PIERS refused to recommend any change in Vaneyck's housing

15

classification resulting in continued isolation in G-pod cell, with recommendation for "low-risk" precautions.

65.   On March 3, 2018, between 3:30 and 4:30 pm, Corrections Officers PETER KIRSTEN and AARON OVERWAY were on duty in G-Pod, responsible for remote surveillance monitoring of all G-pod activities and periodic cell checks.

66. On March 3, 2018, Defendant KIRSTEN was present in G-pod doing physical cell check rounds for a total of 2 minutes between at 3:29-3:31 pm.

67.   On that date, sometime between 3:30 and 4:30 pm, decedent Vaneyck was visible to OVERWAY and KIRSTEN by video surveillance, which clearly showed that Vaneyck was carrying a bed sheet tied into a ligature while enroute to the G-pod lavatory.

68. At no time after 3:30 pm, did OVERWAY or KIRSTEN impede Vaneyck's strong likelihood of suicide, despite being able to see him bringing his bedsheet ligature into the lavatory, which put them on actual notice of the likelihood of his intent to commit suicide by hanging.

69.  At or about 4:30 pm Defendant OVERWAY discovered Vaneyck unconscious while hanging from his bedsheet attached to the shower fixture in the G Pod lavatory.

70.  William Vaneyck was conveyed to Spectrum Health where, after 14 days in and out of a coma, he was pronounced dead on March 12, 2017, due to Anoxic Brain Injury secondary to suicide by hanging.

71. At all times leading up and including March 3, 2018, KIRSTEN and OVERWAY were on actual notice of Vaneyck's strong likelihood of suicide based upon actual knowledge of multiple prior suicide attempts and multiple acts of deliberate self-harm, as fully documented in Vaneyck's institutional records.

72. That defendants KIRSTEN and OVERWAY unreasonably, deliberately and/or recklessly disregarded Vaneyck's serious mental health needs by failing to engage Vaneyck at any time during the 3:30 cell check and subsequent two hour out-of-cell time, which would have foiled Vaneyck's imminent plan for suicide conspicuous by his transport of a bedsheet ligature into the G-pod lavatory.

73.  That defendants KIRSTEN and OVERWAY unreasonably, deliberately and/or recklessly disregarded Vaneyck's serious mental health needs by failing to monitor Vaneyck both physically or by remote video surveillance at any time after 3:30 pm through the time Vaneyck was discovered hanging by a bed sheet in the G-pod lavatory at or about 4:30 pm.

74. The moving force behind KIRSTEN and OVERWAY's unreasonable, deliberate and/or reckless disregard for Vaneyck's safety during out-of-cell time was the customs, policies and/or practices of defendants OTTAWA COUNTY,

WELLPATH/CCS and CMHOC – including but not limited to the absence of written procedures -- regarding the clearly established need to closely monitor inmates such as decedent Vaneyck with known strong risk of suicide during out-of-cell time including access to jail bedding during lavatory usage.

75.  That between December 2017 and March 3, 2018, decedent William Vaneyck was housed in G-pod in isolation, with no cellmate and with only one other inmate in the entire housing unit, resulting in isolation for 22 hours per day, despite the known increased risk of suicide among inmates housed in isolation who have known history of repeated suicidality.

76. That between January 13, 2018 and March 3, 2018, defendants acted objectively unreasonably, with reckless disregard and/or with deliberate indifference to decedent Vaneyck's serious mental/medical need by their failure to take adequate precautions to provide even minimum mental health care, medical care, supervision, assessment and observation, both individually and/or pursuant to the customs, policies and/or practices of Defendants COUNTY, CMH and/or WELLPATH f/k/a CORRECT CARE.

77.  That between January 13, 2018 and March 3, 2018, Defendants PIERS, DERKSEN and NATOLE failed to provide a treatment plan for what they knew was Vaneyck's strong likelihood of suicide, and *inter alia* any plan to deal with

Vaneyck's medication refusal, despite his known history of serious mental illness, repeated suicidality and substantial self-harm.

78.  That from December 9, 2017 through March 3, 2018, Defendant Capt. Steven Baar's refusal to remove Vaneyck from G-pod isolation despite actual knowledge it was "not safe to leave (Vaneyck) in G3" was objectively unreasonable and/or deliberately indifferent and/or based upon a reckless disregard for inmate health or safety.

79.  That after December 9, 2017, Defendants PIERS, DERKSEN and NATOLE recklessly disregarded an objectively unreasonable  substantial risk to inmate safety by refusal and/or failure to act to have Vaneyck removed from G3 isolation cell housing despite actual and/or constructive knowledge that, it was "not safe to leave (Vaneyck) in G3", which was a moving force in Vaneyck's death.

80.  That between January 13, 2018 and March 3, 2018, individual defendants MARY DERKSEN, NP and DR. NATOLE failed or refused to examine Vaneyck at any time either prior to prescribing psychotropic /antidepressant medication and/or after Vaneyck's refusal of medications, despite being on actual notice of Vaneyck's serious mental illness and multiple suicide attempts evidencing a strong likelihood of continued suicidality.

81. That beginning July 19, 2017, Defendant TIM PIERS, LLMSW was on actual notice and/or had actual knowledge of Vaneyck's diagnosis of major depressive disorder, including but not limited to Vaneyck's declaration noted in the CMHOC record, that "no one can stop him and he will continue  attempting suicide until he is successful", including multiple repeated suicide attempts and obvious mental illness with reported auditory voices telling him to engage in self-harm, TIM PIERS effectively ignored this serious medical need and made no referral to psychologist, psychiatrist or other qualified mental health provider.

82.  Defendants PIERS, DERKSEN and NATOLE acted with objective unreasonableness, reckless disregard and/or deliberate indifference to Vaneyck's serious need for psychiatric/psychological management, despite being on actual notice of Vaneyck's serious mental illness, medication refusal, substantial self-harm including repeated head striking and persistent suicide attempts by hanging.

83.   That all defendants acted with objective unreasonableness, reckless disregard and/or deliberate indifference to Vaneyck's persistent suicidality by failing to monitor Vaneyck during the two (2) hour out-of-cell time with actual knowledge of Vaneyck's expressed intention to commit suicide by hanging until completion.

84. That all defendants acted with objective  unreasonableness, reckless disregard and/or deliberate indifference to Vaneyck's persistent suicidality based

upon defendants' allowing Vaneyck access to a bed sheet and blanket objects easily fashioned into a ligature based upon Vaneyck's prior attempts at suicide by hanging with a bed sheet.

85. Vaneyck remained segregated with minimal observation, no out-of-cell time monitoring and never evaluated by a psychiatrist or psychologist.

86. Defendant TIM PIERS ordered WILLIAM VANEYCK to be placed on elevated risk without qualified medical/mental health evaluation or referral despite need for treatment so obvious that even a lay person would have recognized the need for psychological/psychiatric evaluation.

87. Defendant Capt. STEVEN BAAR acted with objective unreasonableness, reckless disregard and/or deliberate indifference to Vaneyck's serious mental health need through use of objectively unreasonable prolonged use of restraint chair constituting excessive and/or arbitrary force in response to each of the multiple acts of self-harm and multiple suicide attempts, described in detail above, which was reckless disregard for substantial risk to inmate health or safety; deliberate indifference to serious mental health need and unreasonable use of force.

88.  Defendant Capt. STEVEN BAAR'S supervisory authorization of prolonged and repeated use of restraint chair in response to obvious mental illness and observable self-harm, including multiple suicide attempts was objectively

unreasonable force directed against Vaneyck while housed in the OCJ as a pretrial detainee under *Kingsley*.[1]

89. That at all times Defendants Capt. STEVEN BAAR, TIMOTHY PIERS, MARY DERKSEN, NP; DR. JOSEPH NATOLE, MD were on actual notice of Vaneyck's serious mental health and medical needs based upon documented persistent suicidality and self-harming acts, history of serious mental illness including bipolar disorder, traumatic brain injury and chronic depression.

90. That at all times Defendant Capt. Steven Baar's decisions and actions were taken in his official capacity which constitute the customs/policies/practices of Defendant County.

91. That at all relevant times, Defendants MARY DERKSEN, NP and DR. JOSEPH NATOLE failed to monitor plaintiff or otherwise provide any specific individualized treatment plan for Vaneyck for serious mental health need by prescribing psychotropic medications without evaluation and with knowledge that VanEyck was refusing medications despite knowledge of serious mental health contrary to both jail medical protocols and generally accepted protocols of the National Commission on Correctional Health Care Guidelines and/or Clinical Practice Guidelines Federal Bureau of Prisons.

---

[1] *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015),

22

92. That the actions of each individual defendant resulted in unreasonable delay and/or denial of critical access to qualified mental health and medical judgment resulting in Vaneyck's death by suicide.

93.   That the policies, procedures and practices of defendants Ottawa County, Wellpath/CCS and Community Mental Health Ottawa County pertaining to mental health and medical care of inmates who exhibit persistent suicidality manifesting a strong likelihood of suicide after nine (9) prior suicide attempts within eight (8) month incarceration is constitutionally deficient and was the moving force behind the violation of plaintiff decedent's rights under the Eighth and Fourteenth Amendments resulting in an obvious lack of adequate training and enforcement of what policy does exist.

94.   The acts and/or omissions of defendants were in wanton disregard of plaintiff's constitutional right to be free from deliberate indifference to serious medical need, including but not limited to access to qualified medical care without unreasonable delay, resulting in extreme physical, emotional pain and suffering and death, the actions were without regard to human dignity or presence in violation of the provisions of the Eighth and Fourteenth Amendments to the United States Constitution.

95.  The actions and/or omissions of the individual defendants

constitute a deliberate indifference to the serious medical needs of the decedent and demonstrate a reckless, willful and/or wanton disregard for the health and safety of the decedent, thereby denying him the constitutional right to be free from cruel and unusual punishment as provided by the Eighth Amendment to the United States Constitution.

96.    As a direct and proximate result of the actions and/or omissions of the various defendants, plaintiff's decedent suffered great physical pain, discomfort, loss of mental capacity, humiliation, degradation and suffering and death of William Vaneyck on March 12, 2018.

97.  The acts and/or omissions of individual defendant Capt. STEVEN BAAR constitute both objectively unreasonable force and deliberate indifference in violation of clearly established rights under the Eighth and Fourteenth Amendments.

98. As a direct and proximate result of the acts and/or omissions of the various defendants, plaintiffs have sustained and are entitled to compensation for conscious pain and suffering of the deceased, funeral, burial and economic costs and/or damages, loss of support, loss of gifts and gratuities, loss of love, society and companionship and all other damages recognized by the Michigan Wrongful Death Act, MCL 600.2922.

99.  By the aforementioned actions and/or omissions, defendants

have deprived plaintiff's decedent of the rights secured by the Eighth and

Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C.

§1983.

100.   Defendants are not entitled to governmental immunity or other

immunities provided by law.

WHEREFORE, Plaintiffs request the following relief:

A. Compensatory non-economic and economic damages in excess of
Seventy-Five Thousand Dollars ($75,000.00), including but not
limited to, all damages recoverable under the United States
Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of
Michigan, including, but not limited to the Michigan Wrongful Death
Act, MCL 600.2922.

B. Punitive damages and exemplary damages;

C.  Reasonable attorney fees, costs and interest; and

Such other and further relief as appears reasonable and just under the

circumstances.

## COUNT I

**42 U.S.C. §§ 1983 and 1988**
**EIGHTH AND FOURTEENTH AMENDMENTS,**
**DUE PROCESS, DELIBERATE INDIFFERENCE TO KNOWN**
**SERIOUS MEDICAL NEED, UNREASONABLE/EXCESSIVE FORCE,**
**SUPERVISORY LIABILITY**

**(Defendants OTTAWA COUNTY, WELLPATH f/k/a CCS, COMMUNITY**
**MENTAL HEALTH OTTAWA COUNTY, Capt. STEVEN BAAR, PETER**
**KIRSTEN, AARON OVERWAY,  TIMOTHY PIERS, MARY DERKSEN,**
**JOSEPH NATOLE, MD, Capt. STEVEN BAAR**

101. Plaintiff incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

102. That from the time of booking all defendants had actual knowledge of William Vaneyck's serious medical/mental health need based upon confirmed diagnosis of *inter alia,* traumatic brain injury, bipolar disorder, chronic depression and suicidal ideation.

103. That from the time of booking on July 15, 2017 through death on March 12, 2018 all defendants had actual knowledge of Vaneyck's substantial risk of suicide including strong likelihood that he would attempt suicide by strangulation until final execution based on nine (9) documented suicide attempts and twelve (12) separate deliberate acts of substantial self-harm.

104. That despite actual knowledge of the strong likelihood of suicide defendants TIM PIERS, DERKSEN and NATOLE failed and/or refused to provide access to qualified mental health care including but not limited, to psychiatric evaluation at any time after July 22, 2017 despite Vaneyck's serious mental/medical need following each act of self-harm/attempted suicide "so obvious that even a lay person would easily recognize the necessity for a doctor's attention". *Blackmore v Kalamazoo County,* 390 F.3d 890 (6th Cir. 2004)

105. That in the Sixth Circuit, Vaneyck had a clearly established "[R]ight to screening for suicidal propensities or tendencies… when it is *obvious* that an

26

inmate has such tendency or propensity[.]" *Gray v. City of Detroit*, 399 F.3d 612,

616 (6th Cir. 2005)

106. That despite actual knowledge of the strong likelihood of suicide

defendants TIM PIERS, DERKSEN and NATOLE failed and/or refused to provide

a treatment plan although Vaneyck's serious mental/medical need was so "obvious

that even a lay person would easily recognize the necessity for a doctor's

attention".

107.  That despite actual knowledge of the strong likelihood of suicide

defendants DERKSEN and NATOLE failed and/or refused to personally assess,

evaluate or even speak to Vaneyck at any time after each act of self-

harm/attempted suicide or prior to prescribing psychiatric medications or after

Vaneyck refused psychiatric medications constituting reckless disregard for

substantial risk to inmate safety.

108. That despite actual knowledge of the strong likelihood of suicide

defendants Capt. BAAR, PIERS, DERKSEN and NATOLE failed to take action to

remove Vaneyck from isolation with knowledge that prolonged housing in

segregation/isolation would result in exacerbation of an already strong likelihood

of suicide based upon Vaneyck's history of persistent suicidality, mental illness,

depression and substantial self-harm.

109.  That despite actual knowledge of the strong likelihood of suicide defendants Capt. BAAR, KIRSTEN, OVERWAY, PIERS, DERKSEN and NATOLE allowed Vaneyck unrestricted access to bedsheets and blankets with knowledge that such items are instrumentalities known to be fashioned into ligatures by inmates with a strong likelihood of suicide based upon OCJ history of four (4) prior successful suicides at the OCJ.

110. That despite actual knowledge of Vaneyck's strong likelihood of suicide defendants Capt. BAAR, KIRSTEN, OVERWAY, PIERS, DERKSEN and NATOLE allowed Vaneyck unrestricted access to bedsheets and blankets with knowledge that such items are instrumentalities known to be fashioned by Vaneyck into ligatures based upon Vaneyck's nine (9) prior suicide attempts by strangulation.

111.   That despite actual knowledge of the strong likelihood of suicide defendants Capt. BAAR, KIRSTEN, OVERWAY, PIERS, DERKSEN and NATOLE took no action to provide monitoring over Vaneyck's 2-hour out-of-cell time while recklessly disregarding Vaneyck's unrestricted access to bedsheets and blankets during lavatory usage.

112. That despite actual knowledge of serious mental illness, including bipolar disorder, traumatic brain injury, depression, history of twelve (12) deliberate acts of substantial self-harm and nine (9) separate attempts at suicide by

strangulation defendant jail supervisor Capt. BAAR personally authorized prolonged chair restraint in response to obviously serious mental health need, amounting to objectively unreasonable force directed against a pretrial detainee, unreasonable force/seizure, malicious harm constituting cruel and unusual punishment and deliberate indifference to serious mental/medical need.

113. As a direct and proximate result of the actions and/or omissions of all defendants, Vaneyck suffered unnecessary pain, suffering, exacerbation of mental illness and death with conscious pain and suffering on March 12, 2018.

114. As a direct and proximate result of the acts and/or omissions of all defendants, plaintiffs have sustained and are entitled to compensation for conscious pain and suffering of the deceased, funeral, burial and economic costs and/or damages, loss of support, loss of gifts and gratuities, loss of love, society and companionship and all other damages recognized by the Michigan Wrongful Death Act, MCL 600.2922.

115. By the aforementioned actions and/or omissions, defendants deprived plaintiff's decedent of rights secured by the Eighth and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. §1983.

116. Defendants are not entitled to governmental immunity or other immunities provided by law.

117.   Punitive damages are available against individual defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade,* 461 U.S. 30 (1983).

118.  Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs request the following relief:

A.  Compensatory non-economic and economic damages in excess of Seventy-Five Thousand Dollars ($75,000.00), including but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of Michigan, including, but not limited to the Michigan Wrongful Death Act, MCL 600.2922.

B.  Punitive damages and exemplary damages;

C.  Reasonable attorney fees, costs and interest; and such other and further relief as appears reasonable and just under the circumstances.

## **COUNT II**

**CIVIL RIGHTS VIOLATIONS**
***MONELL V. DEP'T OF SOCIAL SERVICES*, 436 US 658**
**FAILURE TO TRAIN**
**DEFENDANTS OTTAWA COUNTY, WELLPATH f/k/a/ CCS,**
**COMMUNITY MENTAL HEALTH OTTAWA COUNTY**

119. Plaintiff incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

120.   That defendants Ottawa County, Wellpath/ CCS and CMHOC, all acting under color of law, adopted, implemented, supplemented, reinforced and/or promulgated policies, customs, and practices, as set forth below, all of which were

a proximate cause and/or a moving force in the violations of William Vaneyck's constitutional rights

121.    Wellpath is the corporate successor to Correct Care Solutions (CCS) following the merger of CCS and Correctional Medical Group Companies ("CMGC") by private equity firm HIG in October 2018 seven (7) months after Vaneyck's suicide.

122.    At the time of Vaneyck's death, CCS was the corporate entity responsible by contract for health care services at the OCJ.

123.    At the time of Vaneyck's death Community Mental Health Ottawa County ("CMHOC") provided mental health services to inmates housed at the OCJ.

124.    Facts known to Ottawa County, Wellpath/CCS and CMHOC policymakers put them on actual or constructive notice that their policies, practices, customs, acts and omissions were substantially certain to result in violation of constitutional rights of pretrial detainees/inmates of the Ottawa County jail, detailed as follows:

    a.  In 2004, pretrial detainee Max Berryhill committed suicide by hanging from a jail-issued cloth bedsheet during unsupervised free time after reporting suicidal ideation.

    b.  In 2007, pretrial detainee John Ketchapaw committed suicide by strangulation while unmonitored after booking as an inmate at "imminent suicide risk".

   c. On August 8, 2013 pretrial detainee Scott Meirs committed suicide by hanging from a jail-issued cloth bedsheet while unmonitored after reporting suicidal ideation.

   d. On September 13, 2013 (35 days after Scott Meirs' suicide) pretrial detainee Daniel Bugielski committed suicide by hanging from a jail-issued cloth bedsheet after reporting suicidal ideation.

125.   That in each of the four (4) prior suicides defendant Ottawa County failed to provide timely access to qualified mental health provider for psychiatric evaluation; monitoring for foreseeable suicidality based upon reported suicide ideation; providing unrestricted access to jail issued cloth bedsheets/blankets foreseeably fashioned into ligatures by detainees/inmates reporting suicidal ideation.

126.   That in each of the four (4) prior suicides defendant Ottawa County failed to undertake death investigations consistent with national standards including Clinical Mortality Reviews, Administrative Reviews or Psychological Autopsy specifically designed to prevent future suicides at the OCJ.

127. That following each of the four (4) prior suicides defendant Ottawa County failed to train corrections officers pursuant to nationally recognized standards regarding management of persistently suicidal inmates.

128.   That following each of the four (4) prior suicides defendant Ottawa County failed to implement any written policies or practices including but not

limited to, restricting access to jail issued cloth bedsheets for detainee/inmates reporting suicidal ideation.

129.  That defendant Ottawa County had a pattern, practice, policy, and/or custom which was the moving force behind violation of Vaneyck's clearly established rights, including but not limited to the following:

a. Allowing unrestricted access to jail issued cloth bedsheets and blankets to inmates with strong likelihood of suicide.

b.  Issuing cloth bedsheets and blankets foreseeably used as ligatures to detainees/inmates with strong likelihood of suicide.

c. Failure to monitor inmates with strong likelihood of suicide during out-of-cell time including unmonitored/unrestricted lavatory usage.

d. Policy/practice of housing pretrial detainees/inmates with strong likelihood of suicide in segregation/isolation without cellmates or other human interaction for 22 hours per day resulting in foreseeable exacerbation of mental illness, depression and suicidal ideation.

e. Policy/practice of housing pretrial detainee/inmates with strong likelihood of suicide in RTOX cells equipped with half-walls despite history of Vaneyck jumping from the half-wall head-first multiple times while attempting suicide, causing substantial self-harm.

f. Failure to undertake death investigations of four (4) prior suicidal inmates consistent with national standards, including but not limited to Clinical Mortality Reviews, Administrative Reviews and Psychological Autopsy in order to prevent future suicides.

g. Policy/practice of prolonged chair restraint as punishment for detainee/inmates with strong likelihood of suicide following suicide attempts and deliberate acts of substantial self-harm in lieu of referral to qualified mental health provider for psychiatric evaluation.

h.  Policy/practice of reliance upon underqualified social workers acting as gatekeepers instead of psychiatrists or other qualified mental health provider for evaluation of persistently suicidal inmates following every suicidal attempt/substantial self-harm.

i.  Failure to formulate written policy addressing persistently suicidal inmates showing strong likelihood of suicide.

j.  Failure to formulate written policy or practice of not requiring psychiatric or other qualified mental health evaluation following suicidal attempts/substantial self-harm.

k.  Failure to formulate written policy including training of jail supervisors, jail captain and corrections officers regarding management and observation of persistently suicidal inmates showing strong likelihood of suicide;

l.  Failure to formulate policy including training of medical providers regarding constitutional rights of inmates with strong likelihood of suicide to timely access qualified medical/mental health providers.

130.   As a direct result of defendant Ottawa County's policies, practices and customs amounting to reckless disregard for substantial risk to inmate health or safety as described above, Vaneyck was never properly evaluated, housed and managed despite a strong likelihood of suicide, instead Vaneyck was subjected to excessive force by prolonged chair restraint following multiple suicide attempts, denied access to qualified mental health care/psychiatric evaluation and ultimately allowed unmonitored lavatory usage with unfettered access to jail issued cloth bedsheets/blankets known to be used  as ligature resulting in Vaneyck's foreseeably successful suicide by hanging/strangulation in the OCJ lavatory.

131.   Defendant Wellpath/CCS had a pattern, practice, policy, and/or

custom which was the moving force behind violation of Vaneyck's clearly

established rights, including, but not limited to the following:

a. Policy/practice of reliance upon underqualified social workers acting
   as gatekeepers instead of other qualified medical and/or mental health
   providers for suicide risk assessments following suicide attempts or
   other acts of substantial self-harm.

b. Policy/practice of allowing medical providers including DERKSEN
   and NATOLE to prescribe/dispense psychiatric medications without
   direct personal evaluation.

c. Policy/practice of medical providers including DERKSEN and
   NATOLE of failing to evaluate detainees/inmates with serious
   mental illness following medication refusals.

d. Policy/practice of medical providers including DERKSEN and
   NATOLE of failing to evaluate detainees/inmates following suicide
   attempts or deliberate acts of substantial self-harm.

e. Policy/practice of failing to train corrections officers including jail
   captain, regarding constitutional rights of inmates with strong
   likelihood of suicide to timely access to qualified medical/mental
   health providers.

f. Failure to formulate written policy including failure to train medical
   providers, including social workers regarding constitutional rights of
   inmates with strong likelihood of suicide to timely access to qualified
   medical/mental health providers.

g. Failure to provide written policies to prohibit corrections officers,
   including jail captain from utilizing chair restraint following suicide
   attempts or other acts of substantial self-harm.

h. Failure to formulate written policy/practice to provide treatment plans
   for detainees/inmates with strong likelihood of suicide based upon
   multiple prior suicide attempts.

     i.   Failure to formulate written policies restricting access of detainees/inmates with strong likelihood of suicide to jail issued bedsheets/blankets

     j.   Failure to formulate written policies requiring psychiatric evaluation after every suicide attempt or act of substantial self-harm by detainees/inmates with strong likelihood of suicide.

132.   As a direct result of defendant Wellpath f/k/a CCS policies, practices and customs amounting to reckless disregard for substantial risk to inmate health or safety as described above, Vaneyck was never timely evaluated, treated and managed despite documented history of a strong likelihood of suicide, instead Vaneyck was denied timely access to qualified medical/mental health care/psychiatric evaluation following multiple suicide attempts, denied physical/mental evaluation by DERKSEN and NATOLE prior to prescription of psych medication and/or medication refusal, denied access to individual treatment plan despite persistent suicidality, resulting in an exacerbation of serious mental illness leading to Vaneyck's foreseeably successful suicide by hanging/strangulation in the OCJ lavatory.

133.  Defendant Community Mental Health Ottawa County had a pattern, practice, policy, and/or custom which was the moving force behind violation of Vaneyck's clearly established rights, including, but not limited to the following:

     a. Policy/practice of reliance upon underqualified social workers acting as gatekeepers instead of psychiatrists or other qualified mental health providers for suicide risk assessments of detainee/inmates with strong

likelihood of suicide following suicide attempts or other acts of substantial self-harm.

b.  Failure to formulate written policy addressing persistently suicidal inmates showing strong likelihood of suicide.

c.  Failure to formulate written policy requiring psychiatric or other qualified mental health evaluation of detainees/inmates with strong likelihood of suicide following suicidal attempts/substantial self-harm.

d.  Failure to formulate policy including training of social workers regarding constitutional rights of inmates with strong likelihood of suicide to timely access to qualified medical/mental health providers.

e.  Failure to formulate written policy to provide treatment plans for detainees/inmates with strong likelihood of suicide.

f.  Failure to formulate written policies restricting access of detainees/inmates with strong likelihood of suicide to jail issued bedsheets/blankets.

g.  Failure to require nurse or physician evaluation prior to prescription of psych medications or after refusal of medications by inmates with history of mental illness including bipolar disorder, depression and suicidal ideation.

h.  Failure to formulate written policies restricting the use of chair restraint by corrections officers including jail captain following detainee/inmates attempts at suicide/self-harm.

134.   As a direct result of defendant Community Mental Health Ottawa County policies, practices and customs amounting to reckless disregard for substantial risk to inmate health or safety as described above, Vaneyck was never timely evaluated by a psychiatrist after July 22nd or even evaluated by a qualified mental health provider, treated and managed despite documented history of strong

likelihood of suicide, instead Vaneyck was denied timely access to qualified

mental health care, including psychiatric evaluation following multiple suicide

attempts, denied qualified mental evaluation prior to prescription of psych

medication or medication refusal, denied access to individual treatment plan for

persistent suicidality, resulting in an exacerbation of serious mental illness leading

to Vaneyck's foreseeably successful suicide by hanging/strangulation in the OCJ

lavatory.

WHEREFORE, Plaintiffs request the following relief:

A. Compensatory non-economic and economic damages in excess of Seventy-Five Thousand Dollars ($75,000.00), including but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of Michigan, including, but not limited to the Michigan Wrongful Death Act, MCL 600.2922.

B. Punitive damages and exemplary damages;

C. Reasonable attorney fees, costs and interest; and such other and further relief as appears reasonable and just under the circumstances.

## COUNT III

## WRONGFUL DEATH

135.  Plaintiff incorporates by reference the allegations in the paragraphs

above as if fully set forth herein.

136.  That individual defendants' wrongful acts and neglect under the

facts of this case were a proximate cause of the wrongful death of William

Vaneyck as set forth in Count I *supra*.

137.  That defendants' wrongful acts were the direct and proximate

cause of the damages as alleged herein, including but not limited to, the loss of

love, affection, companionship, care, protection and guidance and have suffered

and will continue in the future to suffer pain, grief, sorrow, anguish, stress, shock

and mental suffering.

138.  That defendants' actions were the proximate cause of plaintiff's

damages as follows:

   a.  Reasonable medical, hospital, funeral and burial expenses

   b.  Inhumane and tortuous pain and suffering

   c.  Conscious pain and suffering

   d.  Loss of financial support

   e.  Loss of service

   f.  Loss of gifts or other valuable gratuities

   g.  Loss of comfort, society and companionship

   h.  Compensatory damages

   i.  Punitive damages/Exemplary damages

   j.  Any and all other damages otherwise recoverable under the
    Michigan Wrongful Death Act; MCL 600.2922.[2]

---

[2] As allowed by 42 U.S.C. §§ 1983 & 1988, as it adopts and reflects the Michigan

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff requests the following relief:

A. Compensatory non-economic and economic damages in excess of Seventy-Five Thousand Dollars ($75,000.00), including but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of Michigan, including, but not limited to the Michigan Wrongful Death Act, MCL 600.2922.

B. Punitive damages and exemplary damages against individual defendants as allowed by law;

C. Reasonable attorney fees, costs and interest; and such other and further relief as appears reasonable and just under the circumstances.

## **DEMAND FOR TRIAL BY JURY IS HEREBY MADE**

**LAW OFFICE OF KENNETH D. FINEGOOD, PLC**

s/Kenneth D. Finegood
Kenneth D. Finegood, P.L.C.
29566 Northwestern Hwy Ste 120
Southfield, MI 48034
248-351-0608
Dated: March 2, 2023                    KDFesq44@AOL.com
(P36170)

---

Wrongful Death Act, MCL § 600.2922, *et seq.,* see *Robertson v. Wegmann,* 438 U.S. 584 (1978); *Frontier Insurance Co. v. Blaty,* 454 F.3d 590, 598-99 (6th Cir. 2006).